# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**Case No.** ___19-mc-00023___

|  |  |
|---|---|
| IN THE MATTER OF THE *EX PARTE* APPLICATION OF ANDREW REGINALD YEO AND GESS MICHAEL RAMBALDI FOR AN ORDER TO TAKE DISCOVERY PURSUANT TO 28 U.S.C. § 1782 | ) ) ) ) ) |

---

### *EX PARTE* APPLICATION FOR AN ORDER
### TO TAKE DISCOVERY PURSUANT TO 28 U.S.C. § 1782
### AND INCORPORATED MEMORANDUM OF LAW

Applicants Andrew Reginald Yeo and Gess Michael Rambaldi (together, the "Applicants") respectfully submit this *Ex Parte* Application for an Order to Take Discovery Pursuant to 28 U.S.C. § 1782 (the "Application") from Alpine Bank, a bank located in this District, about various entities believed to be controlled by Paul Rennie ("Mr. Rennie"). The requested relief is for the purpose of obtaining limited, but important, discovery for use in a contemplated proceeding claiming breach of a settlement agreement (the "Breach of Settlement Agreement Proceeding") before the Federal Court of Australia, Victoria District Registry (the "Australian Federal Court").

The U.S. District Court for the Southern District of New York (the "Southern District of New York") has twice approved Section 1782 discovery concerning the Breach of Settlement Agreement Proceeding. Those applications, so-ordered on January 8, 2018 and November 1, 2018 (the "Prior Applications"), were expressly approved by the Australian Federal Court. The resulting discovery has revealed additional accounts that appear to be owned by, or held for the benefit of, Mr. Rennie, in breach of the settlement agreement.

1

That discovery now brings the Applicants to this District. The Australian Federal Court invited discovery concerning accounts at an Alpine Bank, and the Southern District of New York thus authorized discovery from Midlands State Bank, which acquired Alpine Bank & Trust Company. But that discovery revealed that the relevant information may in fact be in the possession of a different entity—Alpine Bank—which can be found in the District of Colorado. Applicants now seek the Court's assistance obtaining discovery from this entity concerning these additional accounts and the entities in whose name they are held.

## I.      JURISDICTION AND VENUE

1.      This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1782(a).

2.      Venue in this District is proper under 28 U.S.C. § 1391 because the intended subpoena recipient is found in this District.

## II.      RELEVANT INDIVIDUALS AND ENTITIES

### A.  THE APPLICANTS

3.      The Applicants are the court-appointed liquidators of two Australian companies, Rennie Produce Pty Ltd ("RP") and Rennie Produce (Aust) Pty Ltd ("RPA") (together, the "Rennie Companies"), both in liquidation proceedings before the Australian Federal Court (the "Australian Liquidation Proceeding"). *See* Declaration of Mason Simpson (hereinafter, "Simpson Decl."), Ex. A. (October 11, 2018 Declaration of Andrew Reginald Yeo (the "Yeo Decl.")) ¶ 17.

### B.  MR. RENNIE AND THE RENNIE COMPANIES

4.      The Rennie Companies were predominantly in the business of growing potatoes in Australia. *See id.* ¶ 6.

5.      At all material times, Mr. Rennie was the director of the Rennie Companies. *See id*.

¶ 18.

6.      On October 3, 2012, the Applicants, Mr. Rennie, and certain of his companies and

affiliates[1] (together, the "Rennie Parties") executed a settlement agreement requiring the

repatriation into Australia of assets under Mr. Rennie's control to satisfy a portion of the Rennie

Companies' outstanding debt to the Australian Taxation Office (the "Settlement Agreement"). *See*

*id*. ¶ 27. A true and Correct copy of the October 3, 2012 Settlement Agreement is attached as

Exhibit 10 to the Yeo Decl. (Simpson Decl., Ex. A).

7.      The Applicants believe Mr. Rennie is in breach of the Settlement Agreement for

failing to repatriate assets owned by various offshore entities that are registered in the British

Virgin Islands ("BVI"), Guernsey, and Hong Kong and that appear to hold funds or assets for his

benefit. *See* Simpson Decl., Ex. A (Yeo Decl.) ¶¶ 47-52.

### C.  THE SUBPOENA RECIPIENT AND DISCOVERY TARGETS

8.      In furtherance of their contemplated Breach of Settlement Agreement Proceeding,

the Applicants seek to obtain discovery from a bank located in this District (the "Subpoena

Recipient") about payments to or from Mr. Rennie and entities believed to be under Mr. Rennie's

control (the "Discovery Targets").[2] Specifically, the Applicants seek to obtain evidence showing

that the Discovery Targets have undisclosed cash assets that they have been maintaining and

---

[1] These were Paul Nicholas Rennie; Bridgit Rennie; Agren Pty Ltd; Agrico Produce Pty Ltd; Agtec
Agriculture Pty Ltd; Australian Cherry Company Pty Ltd; Bridland Pty Ltd; Camira Investments
Pty Ltd; Lachlan Produce Pty Ltd; Lachlan Tesco Holdings Pty Ltd; Lodi Pty Ltd; and Moora
Farming Pty Ltd. *See* Simpson Decl., Ex. A (Yeo Decl.) ¶ 6, n.1.
[2] Depending on the discovery results obtained if this Application is granted, the Applicants may
choose and reserve the right to seek further relief from this Court in order to serve subpoenas on
additional recipients and/or seek information about additional discovery targets.

moving outside Australia.  As set out more fully below, the non-disclosure and non-repatriation of those assets is a breach of the Settlement Agreement.  Further, and as a result of that breach, the Applicants are entitled to seek a judicial determination from the Australian Federal Court that they can take title to those assets under the Settlement Agreement.

9.      The Subpoena Recipient is Alpine Bank, a Colorado Bank with a branch in the District of Colorado at 2200 South Grand Ave., Glenwood Springs, Colorado 81601 ("Alpine Bank").

10.     Alpine Bank appears to hold financial accounts for Mr. Rennie and the Discovery Targets. *See id..* ¶¶ 57-59.

11.     The Discovery Targets include:

   i.    Paul and Bridgit Rennie;

   ii.   Holland Management Limited, a company incorporated in the BVI ("Holland Management");

   iii.  Karinga Investments Limited, a company incorporated in the BVI ("Karinga Investments"); and

   iv.   Karinga/King Ranch LLC, a company incorporated in Colorado ("Karinga/King Ranch").

         *See id.* ¶¶ 8, 9.

### III.    FACTUAL BACKGROUND

#### A. THE ATO INVESTIGATION

12.     In 1997, the Australian Taxation Office ("ATO") commenced an investigation into the financial affairs of Mr. Rennie and companies owned and operated by him, including RP and RPA. *See id.* ¶ 18.

13.     Through their investigation, the ATO identified several tax fraud and tax evasion schemes perpetrated by Mr. Rennie and his companies (the "Tax Schemes"). *See id.* ¶ 19.

14.     One of the Tax Schemes involved the dissipation of funds through various shell entities in the name of Hong Kong-based businessman, Alan Cheung (also known as Zhang Fang Zhou) (the "Alan Cheung Scheme"). *See id.* ¶ 20.   In the Alan Cheung Scheme, the Rennie Companies purportedly provided services and sold plant breeder rights through various BVI and Hong Kong entities to companies owned and controlled by Mr. Cheung. *See id.* There is no evidence of any services or consideration actually having been provided. *See id.* Nonetheless, Mr. Cheung's companies received at least AUD $7,063,947 million (approximately US $5.4 million) under these schemes and Mr. Rennie's companies claimed tax deductions for the payments in the schemes. *See id.* & Exs. 15–18 to Yeo Decl. (attached to Simpson Decl., Ex. A).

15.     Eventually, through its investigation into the Tax Schemes, the ATO identified tens of millions of Australian dollars in unpaid tax liabilities from RP and RPA (the two Rennie Companies of which the Applicants are liquidators), as follows:

> i.      RP has an unsatisfied tax liability of AUD $10,342,745.12 (approximately US $8.0 million) to the ATO. *See* Simpson Decl., Ex. A (Yeo Decl.) ¶ 21 & Ex. 5.

   ii.  RPA has an unsatisfied tax liability of AUD $51,270,274.81 (approximately US $39.5 million) to the ATO. *See id.* ¶ 21 & Ex. 6.

**B. THE AUSTRALIAN LIQUIDATION AND RECOVERY PROCEEDINGS**

16.  The Applicants were appointed as liquidators of RPA on August 9, 2010, and as liquidators of RP on May 19, 2011. *See id.* ¶ 17.

17.  Upon the Applicants' appointment as liquidators, the Applicants identified what appeared to be transactions entered into by RPA, its former directors and associated entities (the "Rennie Group"), for the purposes of removing assets outside the reach of RPA's principal creditor, the ATO. *See id.* ¶ 22. On February 28, 2011, the Applicants commenced proceeding VID 159 of 2011 in the Victorian district registry of the Australian Federal Court, under section 588FF of Australia's Corporations Act 2001 and in the Australian Federal Court's accrued and equitable jurisdiction, to recover to RPA, for the benefit of its creditors, moneys paid to various related parties in transactions that were entered into at a time when RPA was insolvent for the purpose of defeating the interests of RPA's principal creditor, the ATO (the "Australian Recovery Proceedings"). *See id.* ¶ 24. A true and correct copy of the March 1, 2011 Statement of Claim is attached as Exhibit 8 to the Yeo Decl. (Simpson Decl., Ex. A).

18.  By November 2011, the value of claims or potential claims on behalf of the Rennie Companies against Mr. Rennie and others was approximately AUD $80 million (approximately US $60 million). *See* Simpson Decl., Ex. A (Yeo Decl.) ¶ 25. At the same time, the Rennie Companies owed more than AUD $50 million to the ATO. *See id.*

19.     Presently, the ATO is the sole creditor of both Rennie Companies. *See id.* Based on current exchange rates, the Rennie Companies are indebted to the ATO for approximately US $38 million. *See id.*

### C. THE SETTLEMENT AGREEMENT AND MR. RENNIE'S OBLIGATION TO REPATRIATE FUNDS

20.     On October 3, 2012, after engaging in mediation in November 2011 and again in April 2012, Mr. Rennie, the Rennie Parties, and the Applicants entered into a full and final settlement of the Australian Recovery Proceedings through the Settlement Agreement.[3] *See id.* ¶¶ 26, 27. A true and correct copy of the Settlement Agreement is attached as Exhibit 10 to the Yeo Decl. (Simpson Decl., Ex. A).

21.     Pursuant to the Settlement Agreement, Mr. Rennie and the Rennie Parties were to pay to the Applicants the proceeds of the sale of Mr. Rennie's potato business and to repatriate to Australia funds held offshore for their benefit (the "Offshore Funds"), which funds would be distributed to the Rennie Parties and the Applicants pursuant to a schedule set forth in the Settlement Agreement. *See* Simpson Decl., Ex. A (Yeo Decl.) ¶¶ 29-32 & Ex. 10.

22.     Specifically, under the Settlement Agreement:

   i.    The first AUD $2,556,573.06 in Offshore Funds to be repatriated (the "Repatriated Rennie Sums") would be transferred to the Applicants (Clause 3.7);

---

[3] On April 5, 2013, the Settlement Agreement was amended by a Deed of Variation, but the amendment affects clauses that are not material to this Application. *See* Simpson Decl., Ex. A (Yeo Decl.) ¶ 28.

ii.    Further Offshore Funds repatriated over and above AUD $2,556,573.06, but under AUD $13 million (the "Repatriated Rennie Funds") would be retained by the Rennie Parties (Clause 2.13);

iii.   The Rennie Parties were required to repatriate any remaining Offshore Funds above AUD $13 million to Australia, in which case they would share those funds 50-50 with the Applicants (Clause 3.9); and

iv.   Although the Rennie Parties were obligated to repatriate all the Offshore Funds, to the extent that any Offshore Funds were not repatriated within six months of the execution of the Settlement Agreement, they would become the property of the Applicants (Clause 3.11).

*See id.* ¶ 32 & Ex. 10.

23.    As noted above at paragraph 22(iii), pursuant to Section 3.9 of the Settlement Agreement, the Rennie Parties were to repatriate any other funds in excess of the initial AUD $13 million located outside of Australia as of the execution of the Settlement Agreement (the "Offshore Funds") within six months and share those with the Applicants. *See id.*

24.    In the event the Rennie Parties failed to repatriate and turn over the Additional Repatriation Amount, "the Rennie Parties . . . assign[ed] to the Liquidators (*i.e.*, the Applicants) all right, title and interest in any amount of Offshore Funds[.]" *See id.* Ex. 10, at § 3.11. In other words, the Applicants are entitled to seek a judicial adjudication that they have a legal right to any Offshore Funds that the Rennie Parties failed to repatriate within six months of the execution of the Settlement Agreement. *See id.* ¶¶ 30-33.

25.     Pursuant to the Settlement Agreement, the Rennie Parties have repatriated a total of AUD $13,431,896.67, which has been allocated to the Rennie Parties and the Applicants as set out in the Settlement Agreement. *See id*. ¶ 39.

**D. THE APPLICANTS UNCOVER EVIDENCE THAT THE RENNIE PARTIES HAVE BREACHED THE SETTLEMENT AGREEMENT BY NOT REPATRIATING ALL OFFSHORE FUNDS**

26.     The Applicants have uncovered evidence that the Rennie Parties have not repatriated all Offshore Funds to Australia. *See id.* ¶ 40. Because more than six months have passed since the Settlement Agreement was executed, the Rennie Parties are in breach of Section 3.9 of the Settlement Agreement. *See id.* ¶ 39, 48. Further, under Section 3.11 of the Settlement Agreement, the Applicants are entitled to seek a judicial adjudication that the right, title and interest to the un-repatriated Offshore Funds should transfer to the Applicants and are assets of the Rennie Companies in their liquidation before the Australian Federal Court. *See id.* ¶¶ 48, 49.

27.     In particular, the Applicants have obtained records of wire transfers from DBS Bank in Hong Kong that show that Harrow and Trimaran—two of the BVI companies that appear to hold funds for the benefit of Mr. Rennie (as set out in the Prior Applications)—collectively transferred USD $1,655,477 to Peng Fu Limited, a Hong Kong company, in March 2013. *See id.* ¶¶ 41, 43. This was just before the six-month deadline to repatriate funds (*i.e.*, April 4, 2013). *See id.* According to account opening documents for Peng Fu, Mr. Alan Cheung, the businessman and associate of Mr. Rennie who received funds as part of the Alan Cheung Schemes, was a signatory for the Peng Fu accounts. *See id.* ¶ 42. True and correct copies of the account opening documents are attached as Exhibit 30 to the Yeo Decl. (Simpson Decl., Ex. A).

28. The transfers which show the payment of over US $1.6 million into Peng Fu are as follows:

| Date | Amount USD | Transferor | Transferee | Exhibit to Yeo Decl. (Simpson Decl., Ex. A) |
|---|---|---|---|---|
| March 7, 2013 | $899,999 | Harrow (Bank Sal. Oppenheim) | Peng Fu Limited (DBS Bank) | 28 |
| March 13, 2013 | $699,990 | Harrow (Bank Sal. Oppenheim) | Peng Fu Limited (DBS Bank) | 28 |
| March 28, 2013 | $55,488.37 | Trimaran (Mizrahi Tehafot Bank) | Peng Fu Limited (DBS Bank) | 29 |
| Total | $1,655,477.00 | | | |

29. Of those funds, only US $1.2 million was repatriated to Australia via Mr. Rennie's SCB account in Hong Kong. *See* Yeo Decl. ¶¶ 43-44. True and correct copies of the wire transfer records are attached as Exhibits 22 and 43 to the Yeo Decl. (Simpson Decl., Ex. A). The remaining US $455,000 was instead sent to accounts at Bank of Communication Co. in Hong Kong held by Will Power Trading and Prosperity. *See* Simpson Decl., Ex. A (Yeo Decl.) ¶ 45. Will Power (a BVI company) and Prosperity (a Hong Kong company) appear to be companies controlled by Alan Cheung, who is a signatory to the companies' accounts at Bank of Communication Co. *See id.* As stated above, the ATO previously uncovered several tax fraud and tax evasion schemes whereby Mr. Rennie and his companies dissipated funds through companies controlled by Mr. Cheung. *See id.* ¶¶ 19, 20.

30. Additionally, in connection with the mediation and settlement negotiations, Mr. Rennie (presumably, inadvertently) disclosed the existence of a BVI entity believed to be under his control, Harrow, and that Harrow maintained an account at Bank Sal Oppenheim in Switzerland. *See id.* ¶ 26. This came to light when, in June 2012, after the parties had agreed to the

principal terms of a settlement and just as the settlement agreement was about to be finalized, a dispute arose which jeopardized the settlement. *See id.* To resolve the dispute, the Applicants required an immediate payment of AUD $1 million. *See id.* The Applicants were aware that Mr. Rennie held sufficient funds in Australia to make the payment. *See id*. Nonetheless, Mr. Rennie caused the AUD $1 million payment to be made into his solicitor's trust account from an account held in the name of Harrow at Bank Sal Oppenheim in Switzerland. *See id*. A true and correct copy of the AUSTRAC payment advice is attached as Exhibit 9 to the Yeo Decl. (Simpson Decl., Ex. A). As set out below, Harrow was also a company that received funds as part of the Tax Schemes.

31.     Further, the Applicants have uncovered evidence from the Australian police that Mr. Rennie instructed Bank Mizrahi to make transfers from an account in the name of Bondi Investments Limited ("Bondi') to an account in the name of Trimaran Holdings Limited ("Trimaran"). *See* Simpson Decl., Ex. A (Yeo Decl.) ¶ 52(iii). As set out above, Trimaran is an entity that was involved in the repatriation of funds further to the Settlement Deed. *See id.* ¶ 52(iv). It also received funds as part of the Tax Schemes, as set out below.

32.     In addition, as a result of ongoing investigations, the Applicants uncovered evidence that RPA and other companies within the Rennie Group (for example, Moora Farming Pty Ltd and Meeweella Pty Ltd) expatriated funds in excess of AUD $21 million from Australia to offshore companies during the period of the Tax Schemes investigated by the ATO. *See id.* ¶ 34. These transfers are summarized below:

| Transferee | Period | Receiving Bank | Amount AUD | Exhibit to Yeo Decl. (Simpson Decl., Ex. A) |
|---|---|---|---|---|
| Harrow | June 30, 1997 to June 12, 1998 | Mizrahi | $3,258,875.00 | 12 |
| Trimaran | June 29, 1999 to June 25, 2002 | Mizrahi | $1,203,674.00 | 13 |
| Lexington Provident | September 30, 2004 to July 1, 2010 | Bank Sal. Oppenhiem | $10,191,903.96 | 14 |
| GII | June 24, 2005 to March 4, 2008 | HSBC Hong Kong | $981,320.00 | 15 |
| ITS | June 24, 2005 to March 11, 2009 | Bank of Communications | $2,349,672.00 | 16 |
| Media Plus | April 4, 2007 to May 8, 2007 | Bank of Communications | $112,500.00 | 17 |
| Champion Grow | April 13, 2007 to September 30, 2009 | DBS | $3,620,455.00 | 18 |
| | | TOTAL | $21,718,399.96 | |

33.    Given the evidence that AUD $21.7 million was expatriated from Australia and only AUD $13.43 million was repatriated to Australia—in conjunction with (i) Mr. Rennie's history of the Tax Schemes, (ii) the additional evidence of expatriation of funds to accounts in the names of Harrow and Trimaran on the eve of the repatriation deadline, (iii) Mr. Rennie's apparently inadvertent disclosure of Harrow and its Swiss bank account during settlement negotiations, and (iv) the evidence of Mr. Rennie causing wire payments to be made from Bondi to Trimaran—the Applicants believe discovery in this District will produce evidence of further expatriation and concealment of Offshore Funds, which will support a legal claim that the Rennie Parties breached the Settlement Agreement by failing to repatriate all Offshore Funds and that the Applicants are entitled to recover those funds under the Settlement Agreement. *See* Simpson Decl., Ex. A (Yeo Decl.) ¶¶ 19, 20, 26, 34, 46-54.

34.     Finally, financial records produced in response to subpoenas served on financial institutions following the Court's granting of the Prior Applications have shown that several of Mr. Rennie's companies, including Lexington Provident (a Guernsey company) and North Acton (a BVI company), held funds in offshore accounts long after the repatriation deadline.  *See id.* ¶ 47.

### E.  THE APPLICANTS ARE ENTITLED TO BRING A BREACH OF SETTLEMENT CLAIM IN AUSTRALIA AND RECOVER THE OFFSHORE FUNDS

35.     The Applicants have a claim for breach of Clause 3.9 of the Settlement Agreement to any Offshore Funds not repatriated to Australia. *See id.* ¶ 48. Further, pursuant to Clause 3.11 of the Settlement Agreement, the Applicants may seek a judicial determination that they are entitled to take title to Offshore Funds over and above AUD $13 million that were not repatriated to Australia within the 6-month repatriation period. *See id.* ¶¶ 48–49.

36.     Based on evidence already obtained, the Applicants believe that there was at least US $455,000 in Offshore Funds over and above AUD $13 million (approximately US $10 million) that was not repatriated to Australia but instead diverted to accounts in Hong Kong. *See id.* ¶ 50. These are the funds that were sent by Harrow and Trimaran to Peng Fu, and subsequently remitted to Will Power and Prosperity Finance. *See id.*

37.     Additionally, and as noted at paragraph 33 above, the Applicants are aware that over AUD $21.7 million was expatriated by Mr. Rennie and entities associated with him, and only AUD $13.4 million was repatriated. *See id.* ¶ 35. There is compelling evidence that the Discovery Targets are entities that are holding funds for the benefit of Mr. Rennie and/or the Rennie Parties, and hence their assets are "Offshore Funds" within the meaning of the Settlement Agreement. *See id.* ¶ 52. For instance:

i.    Holland Management, Karinga Investments, and Karinga/King Ranch received their funds from Lexington Provident, a company which in turn received over AUD $10 million as part of the Tax Schemes. *See id.* ¶ 52(i) & Ex. 14.

ii.    Further, Lexington Provident is owned in part by Pembrokeshire, which was a front for Mr. Rennie. *See id.* ¶ 52(ii). Pembrokeshire was the sole director of Bondi and Trimaran, two companies that Mr. Rennie appears to have used to hold his funds. *See id.* ¶ 52(ii). Pembrokeshire's director was Mr. Erdynast, who was Mr. Rennie's Israel-based solicitor. *See id.* ¶ 52(v).

iii.    Hand-written facsimiles were seized from a drawer in a cupboard of Mr. Rennie's bedroom that showed two transfers from an account in the name of Bondi to Trimaran at the United Bank of Mizrahi, Israel. *See id.* ¶ 52(iii).

iv.    Further, Trimaran received funds as part of the Tax Schemes and also repatriated funds through Peng Fu, as explained above. It was the sole unit holder of the Rennie Produce (Aust) Unit Trust, for which RPA is trustee, during the financial years 1999 to 2003. *See id.* ¶ 52(iv). Accordingly, Trimaran was the main beneficiary of Mr. Rennie and Rennie Group's Australian potato farming business during this period. *See id.*

v.    Trimaran participated in the repatriation of funds pursuant to the Settlement Agreement through Peng Fu. *See id.*

38.    Either Karinga Investments (the BVI company) or Karinga/King Ranch LLC (the Colorado company) received funds from Lexington Provident, though it is not clear which one received the funds. *See id.* ¶ 53. The wire records previously produced by UBS bank further to the

Prior Applications identify the recipient as "KARINGA INV.INC. DBA KING RANCH," which could refer to either entity. *See id.* Accordingly, Applicants seek records for both companies. *See id.* In any case, the two companies appear to be affiliated, for example, sharing the same registered address at PO Box 1657, Basalt, Colorado 81621, and the same registered agent, Robyn J. Lawry. *See id.*

39.     Further, Mr. Rennie appears to have an interest in the Discovery Targets through his connection to Mr. Erdynast. *See id.* ¶ 52(v). For instance:

i.     The registered agent for both companies, Robyn J. Lawry, is also connected to Mr. Rennie. Lawry is the wife of Warwick Mobray, who is the law partner of Mr. Erdynast. *See Lawry v. Palm*, 192 P.3d 550, 556 (Colo. Ct. App. 2008) (noting "Mowbray, Lawry's husband"). Mr. Erdynast and Mr. Mowbray were instrumental in setting up the Tax Schemes for Mr. Rennie. *See id.* When the Australian Federal Police raided the offices of Mowbray Erdynast in mid-2000, they found that Mr. Rennie was one of Mr. Erdynast's largest clients. *See id.* Apparently, Mr. Mowbray and Mr. Erdynast fled the country that day and have never returned to Australia. *See id.*

ii.     On October 31, 2011, Harneys issued a notice addressed to Mr. Abe Erdynast of its intention to resign as the BVI registered agent of Holland Management, Karinga Investments, Harrow, Trimaran, Pembrokeshire, North Acton, and Bondi. *See id.* Based on Harneys' October 31, 2011 letter, it seems that Mr. Erdynast was a point of contact for these companies on behalf of Mr. Rennie. *See id.*

    iii.    Mr. Erdynast was the director of Pembrokeshire. *See id.*

    iv.    This conclusion is also supported by the sworn testimony by Mr. Rennie conducted in the Federal Court of Australia, which confirms that Mr. Erdynast managed the flow of funds to and from various BVI entities ultimately controlled by Mr. Rennie:

        i.    The transfer of ownership of units in the Rennie Produce (Aust) Trust was a result of acting on the advice of his solicitors Mr. Erdynast and Mr. Wawrick Mowbray. *See* Simpson Decl., Ex. A (Yeo Decl.) ¶ 52(vi)(a) & Ex. 45 at 48:31.

        ii.    Mr. Rennie paid dividends to Trimaran from the Rennie Produce (Aust) Trust as a result of acting on the advice of Mr. Erdynast and Mr. Mowbray. *See id.* ¶ 52(vi)(b) & Ex. 45 at 49:10 & 50:10.

        iii.    Mr. Rennie gave instructions to Mr. Erdynast to send all offshore funds back to Australia. *See id.* ¶ 52(vi)(c) & Ex. 45 at 14:45.

        iv.    Mr. Rennie gave instructions to Mr. Erdynast which resulted in the repatriation of the AUD $1 million during the settlement negotiations. *See id.* ¶ 52(vi)(d) & Ex. 45 at 19:30.

40.    In sum, the Applicants have compelling reasons to believe that the Discovery Targets are controlled by Mr. Rennie and the Rennie Parties, and that the Discovery Targets control Offshore Funds subject to the Settlement Agreement, but they seek additional evidence of the existence of such Offshore Funds to support their claim in Australia.

41.    The Applicants already have retained solicitors in Australia to advise them on and to prepare the Applicants' contemplated claim in Australia. *See id.* ¶ 54. By this Application they seek evidence in support of the contemplated claim before the Australian Federal Court seeking a judicial adjudication that the Rennie Parties breached the Settlement Agreement and that the Applicants may take title to the Offshore Funds. *See id.* ¶¶ 12-14.

42.    This Application is made to obtain further discovery of bank account records and wire transfer records of payments made or received by the Discovery Targets. *See id.* ¶ 55. This will be important evidence for the Applicants' contemplated claim in Australia for breach of Clause 3.9 of the Settlement Agreement and for their claim to ownership of Offshore Funds not repatriated to Australia under Clause 3.11 of the Settlement Agreement. *See id.* The Applicants do not, however, expect the Subpoena Recipient itself to be a defendant in the contemplated claim in Australia. *See id.*

43.    As noted, this Application seeks discovery from Alpine Bank. *See id.* ¶ 56.

44.    According to wire records from 2008 produced by UBS, the Discovery Targets appear to have accounts at an entity named "Alpine Bank & Trust Co." *See id.* ¶ 58. Based on this information, Applicants sought discovery from Midland States Bank, which acquired Alpine Bank & Trust Company.  As described further below, however, that discovery revealed that the wire records did not pertain to Alpine Bank & Trust Company but instead likely referred to Alpine Bank.

45.    As such, the Applicants seek discovery within the District of Colorado to obtain evidence regarding the existence and transfers of the Rennie Parties' Offshore Funds, as the Applicants have a legal entitlement to seek a judicial adjudication that there was a breach of

contract and that they have title to those funds under Section 3.11 of the Settlement Agreement. *See id.* ¶¶ 55, 62.   Among the documents requested from Alpine Bank are account application/opening documents and bank statements.

46.   Further, the Subpoena Recipient and Discovery Targets are beyond the jurisdictional reach of the Australian Federal Court for purposes of discovery. *See id.* ¶ 65.  As a result, the Applicants are unable to obtain the full scope of needed discovery within Australia due to the extraterritorial location of the Subpoena Recipient and Discovery Targets. *See id.*

### F.   THE AUSTRALIAN FEDERAL COURT HAS AUTHORIZED THE APPLICANTS TO SEEK DISCOVERY UNDER SECTION 1782

47.   On October 5, 2018 the Applicants, in their capacity as the Liquidators of the Rennie Companies, applied to the Federal Court of Australia for approval to seek discovery in the United States pursuant to 28 U.S.C. § 1782. *See id.* ¶ 14. They included with their filing a draft of an application to the Southern District of New York for review and consideration by the Federal Court of Australia. *See id.* A true and correct copy of the October 5, 2018 application to the Federal Court of Australia and certain exhibits thereto are attached as Exhibit 1 to the Yeo Decl. (Simpson Decl., Ex. A).

48.   On October 11, 2018, the Federal Court of Australia approved the Applicants' request to seek documents from several subpoena recipients. *See* Simpson Decl., Ex. A (Yeo Decl.) ¶ 15. One of these subpoena recipients was Midland States Bank.  A true and correct copy of the October 11, 2018 order is attached as Exhibit 2 to the Yeo Decl. (Simpson Decl., Ex. A).

49.   Discovery was sought from Midland States Bank because it had acquired Alpine Bank & Trust Company. *See id.* ¶¶ 10, 58, 59. As noted on the website of the Federal Financial

Institutions Examinations Council, Alpine Bank & Trust Co. was purchased by Midland States Bank on July 14, 2018, and it became a branch of that bank on the same day. *See id*.

### G. THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AUTHORIZES DISCOVERY FROM MIDLAND STATES BANK UNDER SECTION 1782

50.     On October 18, 2018, the Applicants filed an Ex Parte Application for an Order to Take Discovery Pursuant to 28 U.S.C. § 1782 and Incorporated Memorandum of Law. *See* 1:18-mc-00483 (S.D.N.Y.) (Dkt. 1).  On November 1, 2018, the Honorable P. Kevin Castel, United States District Judge for the Southern District of New York, entered an order granting that application and authorizing service of a subpoena on, among others, Midland States Bank. *See* 1:18-mc-00483 (S.D.N.Y.) (Dkt. 6) (Simpson Decl., Ex. B).

51.     Applicants sought discovery from Midland States Bank because it had acquired Alpine Bank & Trust Co. *See id.* ¶ 58. Midland States Bank operates in the Southern District of New York through its branch in Tarrytown, NY. *See id*. Applicants therefore sought account application/opening documents and bank statements from Midland States Bank for the Discovery Targets, to help identify if they hold any Offshore Funds as defined in the Settlement Agreement.

52.     Midland States Bank, after being served with the subpoena, informed the Applicants that it had searched its records and the records of its predecessor, Alpine Bank & Trust Company, and it had found no records of any transactions or accounts involving the Discovery Targets.  Midland States Bank further informed the Applicants that it receives inquiries concerning Alpine Bank & Trust Company that in fact relate to a different entity, Alpine Bank.  Midland States Bank advised the Applicants that the relevant records may be found at Alpine Bank.

## IV.    RELIEF REQUESTED

53.    The Applicants are seeking to obtain evidence in the United States in furtherance of the contemplated Breach of Settlement Agreement Proceeding that they intend to file in the Australian Federal Court.  *See* Simpson Decl., Ex. A (Yeo Decl.) ¶¶ 55, 62.  Specifically, the Applicants seek to obtain from the Subpoena Recipient located within this District records evidencing transfers of funds to and from the Discovery Targets.  *See id.* ¶ 56.  The Applicants expect that the documents requested will provide the Applicants with important information showing the existence of Offshore Funds which demonstrates a breach of the Settlement Agreement and to which the Applicants will seek a judicial determination that they have the legal right to recover.  *See id.* ¶¶ 55, 62.  As discussed herein, the Applicants have compelling reasons to believe that the Discovery Targets are controlled by Mr. Rennie and the Rennie Parties, and that the Discovery Targets control Offshore Funds subject to the Settlement Agreement. *See id.* ¶¶ 51–52.

54.    Accordingly, the Applicants seek discovery in this District on an *ex parte* basis from the Subpoena Recipient about transfers to and from the Discovery Targets. *See id.* ¶¶ 55, 56. The Applicants are prepared to pay reasonable expenses that the Subpoena Recipient may incur in producing the documents required by the subpoena accompanying this application. *See id.* ¶ 68. A copy of the proposed subpoena to the Subpoena Recipient is attached to the Simpson Declaration as Exhibit C. A copy of the proposed Order granting the aforementioned relief is being submitted in conjunction with this application**.**

## V.     MEMORANDUM OF LAW

Title 28, United States Code, Section 1782 ("Section 1782") authorizes discovery by litigants or other "interested persons" for use in proceedings before foreign and international tribunals. In pertinent part, it states:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal . . . The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court.

28 U.S.C. § 1782(a).

The twin goals of the statute are "providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts." *In re Application of Michael Wilson & Partners,* 06–cv–02575–MSK–PAC (MEH), 2007 WL 2221438, at *3 (D. Colo. July 27, 2007) (quoting *In re Malev Hungarian Airlines*, 964 F.2d 97, 99–100 (2d Cir. 1992)).

Here, the Court should issue an order granting the Applicants' *ex parte* Application for discovery because the Applicants have met the statutory prerequisites for relief under Section 1782, and because the factors to be weighed by the Court in exercising its discretion balance in favor of discovery.

### A. THE APPLICATION MEETS THE STATUTORY PREREQUISITES FOR RELIEF UNDER SECTION 1782

A Court has the authority to grant a discovery request pursuant to Section 1782 when the following statutory requirements are met: "(1) the person from whom discovery is sought resides (or is found) in the district of the district court to which the application is made, (2) the discovery

is for use in a proceeding before a foreign tribunal, and (3) the application is made by a foreign or international tribunal or any interested person." *Westjest Airlines, Ltd. v. Lipsman*, 15–mc–00174– MSK–KMT, 2015 WL 7253042, at *2 (D. Colo. Nov. 17, 2015); *see also Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 246 (2004). Each of these statutory requirements is met here.

### i.     The Subpoena Recipient is found in this District.

First, the Subpoena Recipient is found in this District. *See In re Perez Pallares,* 10–cv– 02528–PAB, 2010 WL 4193072, at *1 (D. Colo. October 20, 2010) (concluding that this threshold requirement was met when "respondents reside or can be found in this district."). Namely, the Subpoena Recipient is a financial institution that regularly conducts business in this District, maintains its headquarters in this District, and is incorporated in Colorado.

### ii.     The discovery is sought for use in a foreign proceeding.

As to the second requirement, the discovery sought must be "for use in a proceeding in a foreign or international tribunal." 28 U.S.C. § 1782(a); *see Westjest Airlines*, 2015 WL 7253042, at *2 (authorizing discovery for use in a contemplated Canadian proceeding). The "for use" requirement is met where the applicant is, or will be, a party to a foreign proceeding with the procedural right to submit evidence, without regard as to whether the evidence will ultimately be admissible in the foreign tribunal. *See Republic of Ecuador v. Bjorkman*, 801 F. Supp. 2d 1121, 1123 (D. Colo. 2011) ("Discovery rules in foreign tribunals bear no impact on the provision of assistance under Section 1782, and of course 'the foreign tribunal can place conditions on its acceptance of the information to maintain whatever measure of parity it concludes is appropriate'") (quoting *Intel Corp*., 542 U.S. at 260–62)).

Additionally, the "for use" requirement is met even when there is no pending foreign proceeding, so long as one is within reasonable contemplation. *See Westjest Airlines*, 2015 WL 7253042, at *2 ("for use" requirement met even though proceedings had not yet begun, and citing *Intel Corp.,* 542 U.S. at 243).

In this case, the request for judicial assistance seeks evidence to be used in aid of the Breach of Settlement Agreement Proceeding that the Applicants intend, and for which they are actively preparing, to commence against Mr. Rennie and the Rennie Parties before the Australian Federal Court. To gather this important information, the Applicants have already obtained certain discovery as a result of subpoenas authorized by the Southern District of New York and commenced related discovery proceedings in the BVI. *See* Simpson Decl., Ex. A (Yeo Decl.) ¶ 54. The evidence sought in this District is different than and will supplement the evidence the Applicants have already collected and are in the process of collecting in other jurisdictions. *See id*. ¶¶ 54, 56. This application is aimed at obtaining new evidence from a financial institution that will show the existence of undisclosed funds. *See id*. ¶ 56.

As such, even though the Breach of Settlement Agreement Proceeding is contemplated and not yet pending, it nevertheless qualifies as "a proceeding in a foreign or international tribunal" because the Applicants' retention of Australian counsel and ongoing efforts to gather the required pre-suit evidence, including by commencing this proceeding, are objective factors demonstrating that the Breach of Settlement Agreement Proceeding is more than speculative and is reasonably likely to be commenced within a reasonable amount of time. *Mees v. Buiter*,  793 F.3d 291, 299-300 (2d Cir. 2015) (authorizing discovery that would be used to both plead and to prove a claim

in contemplated litigation); *see generally Intel*, 542 U.S. at 258 ("Section 1782(a) does not limit the provision of judicial assistance to 'pending' adjudicative proceedings.").

Further, when the Applicants commence the Breach of Settlement Agreement Proceeding, under the relevant rules of the Australian Federal Court, the Applicants will have the procedural right to present evidence, including the evidence gathered here, to the Australian Federal Court in support of their claims. *See* Simpson Decl., Ex. A (Yeo Decl.) ¶ 66. Accordingly, the evidence sought here meets the "for use" requirement. *See Republic of Ecuador*, 801 F. Supp. 2d at 1124.

### iii.  The Applicants are interested persons.

As to the third requirement, the Applicants qualify as "interested person[s]" because they are the potential plaintiffs in the contemplated Breach of Settlement Agreement Proceeding against Mr. Rennie and the Rennie Parties. In addition, as explained above, the Applicants are the liquidators of RP and RPA, commenced the Australian Recovery Proceedings to recover assets on behalf of RP's and RPA's creditors, and are parties to the Settlement Agreement with Mr. Rennie and the Rennie Parties that they believe has been breached. *See Intel*, 542 U.S. at 256 & 258 ("No doubt litigants are included among, and may be the most common example of, the 'interested person[s]' who may invoke § 1782," and finding that "Section 1782(a) does not limit the provision of judicial assistance to 'pending' adjudicative proceedings.").

For these reasons, this application meets the statutory requirements for relief under Section 1782 of Title 28 of the United States Code.

### B.  THE DISCRETIONARY *INTEL* FACTORS WEIGH IN THE APPLICANTS' FAVOR AND THE COURT SHOULD EXERCISE ITS DISCRETION TO GRANT RELIEF

Once, as here, an applicant meets the Section 1782 statutory criteria, the Court should determine whether to exercise its discretion to permit the discovery. "Once Petitioner meets the

requirements of Section 1782, this Court must also consider the twin aims of the statute: "providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts." *Michael Wilson & Partners*, 2007 WL 2221438, at *3 (quoting *Malev*, 964 F.2d at 100). In deciding whether to exercise its discretion to permit the Section 1782 discovery, the Court should consider: (1) whether "the person from whom discovery is sought is a participant in the foreign proceeding;" (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance;" (3) whether the request is "an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States;" and (4) whether the discovery is "unduly intrusive or burdensome." *Intel*, 542 U.S. at 264–65. Here, each of these factors supports granting the Application, and favors allowing the requested relief for the following reasons.

First, the Subpoena Recipient is not party to the Australian Liquidation Proceeding or the Australian Recovery Proceedings and are not expected under any circumstance to be parties to or otherwise appear in the Breach of Settlement Agreement Proceeding. *See* Simpson Decl., Ex. A (Yeo Decl.) ¶¶ 55 & 65. As such, discovery pursuant to Section 1782 in this circumstance is precisely what courts have held the statute is for. *See, e.g.*, *Republic of Ecuador*, 801 F. Supp. 2d at 1124 (authorizing discovery into a non-party and noting that the subpoena recipient would not be subject to the jurisdiction of the foreign court, and citing *Intel*, 542 U.S. at 264).

Second, the Court may consider "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court . . .

abroad to U.S. federal-court judicial assistance." *Pallares*, 2010 WL 4193072, at *1(quoting *Intel*, 124 U.S. at 264). Here, the Australian Federal Court's approval of discovery from the Subpoena Recipient demonstrates that the Australian Federal Court is receptive to this Court's assistance in obtaining evidence for use in that forum. *See* Simpson Decl., Ex. A (Yeo Decl.) ¶ 14-15 & Exs. 1–2. Additionally, the Applicants are not aware of any law, rule of evidence or procedure in Australia that conflicts with the provision of assistance by United States courts, and the Applicants are not aware of any basis to believe that the Australian Federal Court would not be receptive to the assistance in this instance. *See id.* ¶¶ 66-67.

Third, the Applicants are not using this proceeding to circumvent foreign proof gathering limits in Australia, or any limits imposed by the laws of the United States. *See Intel*, 542 U.S. at 265. Rather, the Applicants have received permission from the Australian Federal Court to initiate proceedings to gather evidence from entities that will not be parties to the Breach of Settlement Agreement Proceeding and over which the Australian Federal Court does not have jurisdiction, but who likely have in their possession, custody, or control evidence relevant to the Breach of Settlement Agreement Proceeding. *See* Simpson Decl., Ex. A (Yeo Decl.) ¶¶ 15, 55 & 65. Further, the Applicants are not aware of any Australian law that prohibits the discovery sought. *See id.* ¶ 67.

Finally, the Applicants' discovery requests are not "unduly intrusive or burdensome," *Intel*, 542 U.S. at 265, focusing as they do upon evidence relevant to identifying the existence and movement of the Offshore Funds. The Applicants are seeking records from financial institutions that maintain such records in the regular course of business and that routinely produce such records in response to U.S. discovery requests. *See In re Application of Inversiones y Gasolinera Petroleos*

*Venezuela,* 2011 WL 181311 at *13 (S.D. Fla. Jan. 19, 2011) (allowing discovery under Section 1782 absent "specific showing" of burden or intrusive nature of request by respondent). Nor did the Prior Application under Section 1782 seek the same discovery. *See* Simpson Decl., Ex. A (Yeo Decl.) ¶ 56. Further, the Applicants are prepared to pay reasonable costs for collection and copying of such records.

Accordingly, the Court should grant the Application.

## C. THE COURT SHOULD GRANT THE APPLICATION *EX PARTE*

"Ex parte applications for judicial assistance under Section 1782 are permissible because persons subject to Section 1782 subpoenas may file a motion to quash or modify the subpoena under the Fed. R. Civ. P 45(c)(3) or may seek a protective order under Fed. R. Civ. P. 26(c)." *Westjest Airlines*, 2015 WL 7253042, at *2 (citing *Chevron Corp. v. Snaider*, 78 F. Supp. 3d 1327, 1331 (D. Colo. 2015), and *Pallares*, 2010 WL 4193072, at *2). Here, the ATO and the Applicants have already uncovered evidence that Mr. Rennie and the Rennie Companies are prone to shielding assets from their creditors, including by expatriating funds on the eve of the six-month deadline to make payment of the Initial Repatriation Amount. As such, the Applicants make this Section 1782 Application without notice because they believe that if Mr. Rennie or his associates were to learn of these proceedings, they would take steps to further dissipate assets or place them beyond the reach of the Applicants. In addition, there are likely to be criminal sanctions for Mr. Rennie if he were found to have offshore assets that were not disclosed to the ATO; so Mr. Rennie would be further incentivized to prevent the Applicants from discovering such assets. Accordingly, the Applicants request that the Court grant this Application on an *ex parte* basis. "To the extent the

respondents disagree or seek modification of the requirements, such can be the subject of appropriate motions." *Pallares*, 2010 WL 4193072, at *2.

## VI.   CONCLUSION

WHEREFORE, Applicants Andrew Reginald Yeo and Gess Michael Rambaldi pray for an order of this Court:

(1)   granting discovery pursuant to Section 1782, including document requests as detailed in the proposed subpoena attached to this Application;

(2)   ordering that Mason Simpson and Darryl G. Stein be authorized to issue the subpoenas attached to this application to obtain such discovery pursuant to the Federal Rules of Civil Procedure; and

(3)   granting such other and further relief as this Court deems just and proper.

Dated: March 20, 2019          Respectfully submitted,

/s/ Mason C. Simpson
     Mason C. Simpson
ROBINSON & HENRY, P.C.
900 Castleton Road, Suite 200
Castle Rock, CO 80109
303.688.0944
mason@robinsonandhenry.com

Josef M. Klazen
josef.klazen@kobrekim.com
Darryl G. Stein
darryl.stein@kobrekim.com
KOBRE & KIM LLP
800 Third Avenue
212.488.1200
New York, New York 10022

*Counsel for Applicants Andrew Reginald Yeo*
*and Gess Michael Rambaldi*